**KELL et al. v. MULLIGAN. (No. 2176.)**

(Court of Civil Appeals of Texas. Amarillo. June 20, 1923. Rehearing Denied Oct. 3, 1923.)

1. **Brokers** ⊂=86(1)—Evidence held to show defendants were joint owners.

Evidence *held* to sustain finding that defendants as joint owners of the property sold were liable for broker's commission.

2. **Partnership** ⊂=140—Partners held bound by one partner's agreement employing broker.

Where property was owned jointly by members of a partnership, a trust estate represented by one partner, and a corporation for which two of the partners were acting, and such partners knew when a sale was made that a third partner had been negotiating through a broker, all parties were bound by his agreement to pay a commission.

3. **Costs** ⊂=238(2)—Appeal costs taxed against appellants where they did not ask correction of judgment below.

Though personal judgment against executrix must be reformed on appeal under Rev. St. art. 2004, where its entry was probably inadvertent and it would have been corrected if called to trial judge's attention, costs of appeal will be taxed against appellant.

4. **Appeal and error** ⊂=1058(2)—Rejection of evidence harmless where evidence leading to same conclusion admitted.

Rejection of testimony *held* harmless where testimony of the same witness was admitted which, if accepted as true, would have led to the same conclusion as that sought to be deduced from the rejected testimony.

5. **Assignments** ⊂=117—Plaintiff still had legal title, though he assigned his commissions.

Broker who assigned his commissions before trial still had legal title to the chose in action and might bring action in his own name, and, while the equitable owners were proper parties to the suit, they were not necessary parties.

On Motion for Rehearing.

6. **Partnership** ⊂=247—Creditor can subject assets of deceased member of partnership to his claim.

Partnership creditor could subject to payment of his debt not only the partnership as-

---

sets and the property of the surviving partners, but also the property belonging to the estate of the deceased partner.

**7. Abatement and revival ⊜⇒64—Death of one of the defendants does not abate suit against him.**

Under Rev. St. art. 1888, providing that a suit on a cause of action which survives shall not abate because of defendant's death, but that suit may proceed against his administrator, death of one of the defendants does not abate suit against him and require a new proceeding on the claim in the probate court.

Appeal from District Court, Wichita County; Orus O. Ross, Special Judge.

Action by Edward Mulligan against Frank Kell and others. From a judgment for plaintiff, defendants appeal. Reformed and affirmed.

Carrigan, Montgomery, Britain, Morgan & King, of Wichita Falls, for appellants.

Kay, Akin & Kenley, of Wichita Falls, for appellee.

BOYCE, J. Edward Mulligan, appellee, brought this suit against Frank Kell, Ella B. Taylor, executrix, and devisee of T. J. Taylor, deceased, S. W. Sibley, trustee of Thrift Trust No. 4, a trust estate, S. W. Sibley, individually, and the Sanders-Taylor Oil Company, a corporation, to recover commission alleged to have been earned by plaintiff as broker in the sale of an oil lease. It was alleged that the defendants (except Mrs. Taylor, who succeeded to the rights of her husband, T. J. Taylor, who was alive at the time of the transactions out of which the suit arose) were joint owners and partners in the ownership of said oil lease; that Frank Kell, acting for the other defendants, employed the plaintiff to secure a purchaser for said property at the price of $150,000, and agreed to pay the plaintiff a commission of 5 per cent. on the sale price; that plaintiff procured a purchaser in the persons of Young Bros. & Kennedy, to whom defendants sold said property at said price of $150,000 and thereby became liable to pay plaintiff his commission on said enlistment contract. The plaintiff pleaded in the alternative on quantum meruit. The defendants denied partnership or joint ownership. They alleged that the title to the property was in the name of S. W. Sibley, as trustee for Thrift No. 4; that Sibley, under the declaration of trust, had the sole and unrestricted management and control of said property; that the individual defendants were mere certificate holders in said trust estate and were not personally liable for the obligations incurred by Sibley in the management thereof; that the said Sibley did not authorize Frank Kell or T. J. Taylor to make any contract of enlistment for the sale of said property, and if any such contract was made by either of said parties it was not binding; that the said Sibley did not ratify any such contract of employment, but when he accepted Young Bros. & Kennedy as purchasers of said property and entered into contract with them, his information from T. J. Taylor was that a commission of $1,000 was to be paid on the sale.

A trial was had without a jury and judgment rendered for plaintiff for $7,000, it appearing that he had received $500 on the total commission claimed. As appellant's propositions attack the trial judge's findings of fact, we set out briefly such of the evidence as we think sustain these findings: Plaintiff, a broker, approached Sibley and Taylor in reference to the sale of this property and was informed that it was for sale at a price of $150,000. Sibley admits that on one occasion he referred plaintiff to T. J. Taylor, saying:

"You might discuss it with Mr. Taylor, and if he would make a recommendation to me I might consider it."

Plaintiff, according to his testimony, talked with Taylor alone on one occasion and on another with Taylor and Sibley together, and at each time a price of $150,000 was placed on the property. The matter of commission was not mentioned in these conversations, but plaintiff testified that Taylor and Sibley "knew that he was a broker and wanted to make the sale for them." Later plaintiff found Kennedy, a prospective purchaser, and went to Taylor's office in Wichita Falls, where he had previously talked to Taylor and Sibley about the property, but neither of them were to be found. He then went to Frank Kell, who confirmed the sale price of $150,000 and named the terms as one-half cash and balance in three equal monthly payments, and agreed to pay a commission of 5 per cent. on the sale price. The evidence indicates that Kell may have talked over the phone with Sibley, who was in Dallas, something about the sale of the property. There is some conflict as between plaintiff's and Kell's version of the terms of the employment. Kell's testimony is to the effect that he informed plaintiff that—

"Although Mr. T. J. Taylor was handling the property, I would assume the authority to sell it and allow him a commission of 5 per cent., provided we got $150,000 ($75,000 cash and three notes as stated for the balance), and provided that the trade was closed before Mr. T. J. Taylor returned."

Kennedy would not agree to these terms, proposing to pay less cash and to extend the deferred payments over a longer period. Personal negotiations between Kennedy and Kell, with plaintiff assisting, were continued for the period of one day, when Taylor re-

---

turned, whereupon Kell directed Taylor to go with plaintiff to see Kennedy and try to make a deal. The sale was thereafter effected to plaintiff's customer, Young Bros. & Kennedy. The consideration agreed to be paid by the purchasers was, according to the sales contract, $125,000, and the agreement to assume the payment of a further sum of $25,000 out of a certain portion of the proceeds of the operation of the lease, after making a certain stated deduction and payment of the expenses of operation. Of the $125,000, $50,000 was to be paid in cash and the balance in ten equal monthly payments. The sales contract was executed by all of the defendants except Mrs. Taylor, but was signed by T. J. Taylor, and recited that the property was owned by such parties. Frank Kell testified:

"The property described in this petition belonged to Sibley, Taylor & Co. It was a private firm, a private partnership, composed of T. J. Taylor, S. W. Sibley, and myself; and the Sanders-Taylor Oil Company must have had some interest in it. I think there is another interest; just what that is I cannot remember. I never knew the details of the ownership. * * * The interest was divided up, and Sanders-Taylor had an interest in it and the old stockholders of Thrift No. 4, some interest."

Sibley testified in one place that the title to the property was in him as trustee for Thrift Trust No. 4, and the trust declaration was offered in evidence. This trust declaration, however, was executed two years prior to the time of the sale in question, and the evidence indicates that there had been in the interim a sale of the property to other parties; that such purchasers were unable to pay and the property had been taken back for the benefit of the original vendors and other interests that had been attached. From Sibley's own testimony it is not positive that the title to the property was in his name. He says at one place that after the sale to the Allied Corporation and its failure to pay out, "Sibley-Taylor & Co. agreed to take over the property and operate it," and make certain payments to interested parties. In another part of his testimony he says:

"I don't know whether the title was vested in all of the parties or not; I think it was in Thrift Trust No. 4."

Sibley testified that he never authorized any one to sell the property except subject to his approval nor to agree to pay a commission on sale. He does say that his understanding when he signed the sales contract was that they were to pay $1,000 commission. Kell also testified that when he approved the contract as finally made it was with his understanding that the commission was to be $1,000. Mulligan testified that nothing was said about refusing his commission to $1,000. There is a conflict in the testimony as to whether the $150,000 price at which Mulligan was to sell the property was in addition to the assumption of the payment of the $25,000 out of the operation of the lease, which was a charge on the property. The conflict was resolved by the trial court against the defendants.

[1, 2] We think the evidence sufficient to sustain the finding that the defendants, including Taylor, were joint owners of the property and became bound on contract to pay plaintiff 5 per cent. commission on the sale to Young Bros. & Kennedy. The basis of many of the assignments attacking the findings of the trial court is that the evidence conclusively shows that Sibley, as trustee for Thrift No. 4, had the exclusive ownership and control of the property; we do not think that this premise is established by the record. Sibley was, perhaps, the representative of the interest owned by the trust estate, but other parties, to wit, Sibley, Taylor & Co. and Sanders-Taylor Oil Company, appear to have had some interest in the property aside from their interest in the trust estate. Sibley, Taylor & Co. was a partnership, composed of the defendant Sibley, Taylor (deceased), and Kell. Sibley and Taylor were also acting for the corporation, the Sanders-Taylor Oil Company, as Sibley signed the contract for said company as vice president and Taylor as secretary. It seems probable that the partnership of Sibley, Taylor & Co. were operating the lease. Taylor, according to Kell's evidence, was handling the matter of operating and disposing of the property, and Sibley's testimony amounts almost to an admission to the same effect. These three men, Sibley, Taylor, and Kell, represented all the interests in the property, and perhaps as to questions of importance consulted with each other in reference thereto. When, other members of the partnership being absent, Kell assumed to act in the matter of the sale of the property, we think he at least bound the members of the partnership, Sibley, Taylor & Co.; but we think the trust estate and the Sanders-Taylor Oil Company, owners of the other interests in the property, also became bound by this agreement. Taylor and Sibley knew that Kell had been negotiating a sale through Mulligan to Young Bros. & Kennedy. They were bound to have known that Mulligan was expecting to receive a commission on the sale. Sibley admitted that he did know it but was informed by Taylor that the commission would be only $1,000. The trial court may not have accepted the latter statement without qualification. The matter was so handled, with all parties representing the various interests acting together, as that we think the trial court's conclusion that they were all bound by the contract of employment is sustained by the evidence. If the contract be a joint

contract, it makes no particular difference as to their liability whether the defendants be partners or not. Baum v. McAfee, 59 Tex. Civ. App. 55, 125 S. W. 987; 6 R. C. L. 879, § 268.

The record does not, in our opinion, sustain the contention that the undisputed facts show that the contract to pay 5 per cent. commission was expressly made dependent on sale on the terms first made by Kell and before Taylor's return. The plaintiff's evidence presented an issue as to such matter, in which the trial court decided against appellants. According to plaintiff's version of the contract, he would be entitled to the commission when the defendants consummated the sale on terms satisfactory to them, though these varied from the terms of the enlistment. Goodwin v. Gunter, 109 Tex. 56, 185 S. W. 295, 195 S. W. 848.

[3] T. J. Taylor died while this suit was pending, and plaintiff, by an amended petition, suggested his death and made "Ella D. Taylor, his wife, executrix, and devisee, so far as the matter here in controversy is concerned, party defendant in the place and stead of the said T. J. Taylor, deceased." Mrs. Taylor answered with the other defendants and participated in the proceeding of the trial, without stating the capacity in which she was appearing. The judgment was against Mrs. Taylor, without reference to her representative capacity. Appellants now complain that the judgment should not have been against Mrs. Taylor personally. The plaintiff had the right to make Mrs. Taylor, as executrix of the estate of T. J. Taylor, a party to the suit and proceed therewith. R. C. S. art. 1888. But there is nothing in the record that warrants the rendition of a judgment against her individually, and the judgment will be reformed in this respect. R. C. S. art. 2004. But the costs of the appeal will nevertheless be taxed against the appellants as it appears entirely probable that the entry of the judgment against Mrs. Taylor was the result of inadvertence and would have been corrected by the trial judge had the matter been called to his attention.

[4] We are inclined to the opinion that the evidence referred to in the thirteenth and fourteenth propositions was admissible. But testimony of the same witness was admitted which, if accepted by the court as true, would have led to the same conclusion as was sought to be deduced from the rejected evidence, and we are not inclined to believe that any harm resulted from the rejection of the testimony.

[5] Under the fifteenth proposition it is urged that plaintiff cannot maintain the suit because the evidence shows that he was not the owner of the claim sued on, having transferred all his interest therein before the institution of the suit. The evidence shows that before the trade was made plaintiff had agreed to give the purchaser, Kennedy, one-half of his commission, and after the consummation of the sale gave Kennedy an order on the defendants for such one-half. This order was delivered to Taylor and retained by him. Plaintiff afterwards gave another party an order for the other one-half of the commission, with instructions to such party to pay certain debts of the plaintiff to named persons. It does not appear that this order was presented to the defendants. Notwithstanding these transfers, plaintiff continued to be the holder of the legal title to the chose in action and might bring suit thereon in his own name; and while the equitable owners of partial interests therein were proper parties to the suit, no facts are disclosed by the record which makes them necessary parties. Cleveland v. Heidenheimer, 92 Tex. 108, 46 S. W. 30; T. W. Ry. Co. v. Gentry, 69 Tex. 625, 8 S. W. 101; City of San Antonio v. Reed (Tex. Civ. App.) 192 S. W. 553 (1).

We find no reversible error assigned, and the judgment will be reformed and affirmed.

On Motion for Rehearing.

[6, 7] It is now claimed that we were in error in rendering judgment against Mrs. Taylor as executrix. We do not think the authorities cited by appellants to support this contention sustain their proposition. Notwithstanding the dissolution of the partnership by Taylor's death, a partnership creditor had the right to subject to the payment of his debt, not only the partnership assets, but also the property of the surviving partners and the individual property belonging to the estate of the deceased partner. It is said in the case of Gaut v. Reed, 24 Tex. 57, 76 Am. Dec. 94, the first case cited by appellants, that—

"It is the well-settled doctrine in equity, that every partnership debt is joint and several; and therefore the creditor may, at the same time, sue the survivor as such, and proceed against the estate of the deceased partner."

In the ordinary case, where the suit had not been instituted at the time of the death of the partner, it might be necessary to first go to the probate court with the claim—that was the kind of case referred to in Dulaney v. Walshe, 3 Tex. Civ. App. 174, 22 S. W. 131. But article 1888, Revised Statutes, provides for the procedure in the case of the death of a party during pendency of the suit. See Lauraine v. Ashe, 109 Tex. 69, 191 S. W. 563, 196 S. W. 501, and in our opinion applies to the facts of this case. Article 2004, cited in our former opinion, provides for the form of judgment in such case.

The motion for rehearing is overruled.